

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
08/30/2012

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 11-38794 |
| NC12, INC. | § | CHAPTER 7 |
| | § | |
| Debtor(s). | § | JUDGE ISGUR |
| | § | |
| | § | |
| MICHAEL COLLINS, *et al* | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | ADVERSARY NO. 11-3634 |
| | § | |
| SYDOW, *et al* | § | |
| | § | |
| Defendant(s). | § | |

## MEMORANDUM OPINION

The Plaintiffs and Intervenors assert claims against former officers and directors of NC12, the debtor in the underlying bankruptcy case. NC12 was a technology company engaged in developing catalytic gasification processes. Plaintiffs and Intervenors allege that the Defendants stripped NC12 of assets, misappropriated corporate assets, engaged in self-dealing, and improperly removed other directors from NC12's board. The Plaintiffs sue for breach of fiduciary duty, and Plaintiff Michael Collins sues for conversion. The Intervenors sue for breach of fiduciary duty, shareholder oppression, statutory and common law securities fraud, and conspiracy.

The Court grants, in part, and denies, in part, the Intervenors' motion to remand. The Court remands the Intervenors' securities fraud claims, including the aiding and abetting and conspiracy to commit fraud claims, as they are the Intervenors' property; the Court declines to

exercise subject matter jurisdiction over the claims.  The remainder of the Intervenors' claims are the estate's property, and the Court dismisses them for lack of standing.

The Court denies, in part, and abates, in part, the Plaintiffs' motion to remand.  Plaintiff Michael Collins' conversion claim is arguable property of the estate.  If the claim belongs to Collins, the Court may lack subject matter jurisdiction or the claim's potential effects on the estate may be so remote that the Court should discretionarily abstain.  If the claim is property of the estate, Collins lacks standing to assert the claim.  Until the issue is decided, the Court cannot remand the claim; Collins' pursuit of the conversion claim in state court would violate the automatic stay.  The remainder of the Plaintiffs' claims are property of the estate, and the Court dismisses them for lack of standing.

## Background

This proceeding involves numerous Plaintiffs, Defendants, and Intervenors.  The Plaintiffs are Michael Collins, individually and on behalf of NC12, Inc. and Fall River Realty, Ltd.; Ellen Collins, on behalf of BOS, Inc., EnVen, Inc. and Metal Catalyst Ventures, Inc.; BOS, Inc., as a shareholder of NC12; EnVen, Inc., as a shareholder of NC12; Metal Catalyst Ventures, Inc., as a shareholder of NC12; M. Sameer Ahmed, individually and on behalf of NC12 and TSBC South Texas Investors, L.P., as a shareholder of NC12.

The Defendants are Michael Sydow; John T. Preston; Christoph Henkel; C Change Investments, L.L.C.; Sonia Lo; Chalsys Capital Partners L.L.P.; Oscura, Inc.; Brilliant Novelty, L.L.C.; and Meliora Energy Technologies, S.A.R.L.  The Plaintiffs sued the Defendants in Harris County District Court on July 26, 2011.  ECF No. 1-1.

The Plaintiffs assert claims for breach of fiduciary duty, alleging that Sydow, Preston, and Henkel breached their fiduciary duty to the Plaintiffs as shareholders of NC12 by

misappropriating corporate funds. They seek "their proportionate share of economic injuries" as shareholders of NC12. The Plaintiffs sue the other Defendants for aiding and abetting breach of fiduciary duty. The Plaintiffs sue Sydow, Preston, C Change Investments, and Brilliant Novelty for conversion of Collins' interest in Fall River Realty.

The Intervenors filed a petition in intervention on November 11, 2011. The Intervenors are Akila Finance, S.A.; Bosques del Molino, S.A.; Centrans Energy Services, Inc.; Chester Mester Holdings, Ltd.; Deltec Bank & Trust, Ltd.; Emjo Investments, Ltd.; William End; Evans and Petree 401K Plan; First Bay Intertrade; GM Partners; Marair Corporation; W.L. Nichol, IV; Panorama Investment, Ltd.; PC 01 Vermoegens Verw.; Alejandro Santo Domingo; Sinchi Investment; Venturi Global Investments, Ltd.; and H.J. von der Goltz. ECF No. 1-3.

The Intervenors sue Sydow, Preston, and Henkel for breach of fiduciary duty to shareholders and for shareholder oppression. They also sue all Defendants for knowing participation/civil conspiracy to commit fraud and breach of fiduciary duties. The Intervenors sue Sydow and Preston for common law fraud and statutory fraud.

NC12 filed for chapter 11 bankruptcy on October 14, 2011. On December 22, 2011, the Court granted the United States Trustee's motion to appoint an examiner in the case. ECF No. 28. Walter Bissex was appointed examiner. ECF No. 30. Bissex filed a status report on February 15, 2012. ECF No. 41.

The Defendants removed this proceeding on December 15, 2011. The Intervenors filed a motion to remand or abstain on January 17, 2012, arguing that they asserted only direct claims against the Defendants. ECF No. 6. The Plaintiffs joined in the motion to remand on the same day. ECF No. 7.

At a hearing on February 2, 2012, the Court required parties to file briefs on whether the estate owned the claims asserted in this proceeding. The Intervenors and Defendants Sydow, Preston, Henkel, C Change Investments, LLC, and Brilliant Novelty, LLC (collectively, "Sydow Defendants") filed briefs on March 2, 2012. ECF Nos. 12 & 14. The Sydow Defendants also filed a response to the motion to remand on the same day, arguing that the claims were property of the estate. ECF No. 13. The Sydow Defendants also argue that the existence of a joint directors and officers insurance policy with a maximum coverage limit of $1,000,000.00 for defense costs provides another basis for "related to" jurisdiction. ECF No. 13, at 21-22. Additionally, the Intervenors' requested relief of a forced buy-out, they argue, would affect the bankruptcy estate by affecting ownership of the debtor and rearranging bankruptcy priorities. ECF No. 13, at 23. Finally, mandatory abstention does not apply, they argue, because remand would violate the automatic stay. ECF No. 13, at 23.

Defendants Sonia Lo; Chalsys Capital Partners, LLP, and Meliora Energy Technologies, S.A.R.L. (collectively, "Lo Defendants") filed a joinder with the Sydow Defendants' briefing on March 5, 2012. ECF No. 15. The Lo Defendants filed a joinder with the Sydow Defendants' response to the motion to remand on March 7, 2012. ECF No. 17. The Intervenors filed a reply to the Sydow Defendants' brief on March 9, 2012. ECF No. 18.

In NC12's main bankruptcy case, the United States Trustee filed a motion to convert the case to a chapter 7 case on February 28, 2012. No. 11-38794, ECF No. 43. The Intervenors joined in the motion on March 22, 2012. No. 11-38794, ECF No. 51. NC12 filed a response on March 22, 2012, opposing the conversion to chapter 7. No. 11-38794, ECF No. 52. The Court held a hearing on the motion to convert on March 26, 2012 and March 27, 2012. After hearing testimony from Bissex, Sameer Ahmed, Sydow, and Preston, the Court concluded that NC12

was not operating in a meaningful way and had limited assets of an unknown value.  The Court

granted the motion to convert, and Janet S. Casciato-Northrup was appointed chapter 7 Trustee.

The Court set a hearing on the ownership of the claims in this adversary proceeding for

May 15, 2012.  Prior to the hearing, the Trustee and the Intervenors filed briefs.  ECF Nos. 25 &

26.  At the May 15, 2012 hearing, the Court heard arguments as to the ownership of the claims.

The Intervenors filed an additional brief on May 25, 2012.  ECF No. 27.

The Trustee filed a separate adversary proceeding against Michael Collins, Ellen Collins,

and BOS, Inc. on June 5, 2012, seeking a determination of the extent and validity of the estate's

interest in real property in Fall River, Massachusetts and a determination that the property was

subject to either a resulting or a constructive trust.  The Trustee also sued Michael Collins for

breach of fiduciary duty.  Adv. No. 12-3266, ECF No. 1.

The Trustee filed another adversary proceeding against Michael Collins on August 13,

2012.  Adv. No. 12-3376, ECF No. 1.  In Adv. No. 12-3376, the Trustee sues for a declaratory

judgment that Collins does not own any interest in U.S. Patent Application No. 12/363,398 and

the underlying technology; breach of fiduciary duty; and unjust enrichment.

On August 21, 2012, the Court ordered the parties to this adversary proceeding to file a

copy of NC12's Philadelphia Indemnity Insurance Company policy and to stipulate whether the

copy was true and correct.  ECF No. 28.  The Trustee filed a copy of the policy on August 27,

2012, with a stipulation signed by the Trustee, the Plaintiffs, the Intervenors, Sydow, Preston,

Henkel, and the other Defendants.  ECF No. 30.  The Trustee, the Plaintiffs, the Intervenors,

Sydow, Preston, and Henkel stipulate that the copy of the policy is a true and correct copy.  ECF

No. 30, at 1.  The other Defendants have no basis either to dispute the authenticity of the policy

or to stipulate that the copy is true and correct.  ECF No. 30, at 2.

### The Plaintiffs' and Intervenors' Allegations

The Plaintiffs and Intervenors allege that the Defendants, who were directors and officers of NC12, engaged in self-dealing and mismanagement with the ultimate result of stripping NC12 of its most valuable assets. For context, the Court summarizes the allegations made by the Plaintiffs and Intervenors. By summarizing the allegations, the Court does not find that the allegations are meritorious. Nevertheless, the Court must assume that the allegations are true for the purpose of ruling on the pending motions.

NC12 was involved in the development of catalytic gasification technology. ECF No. 1-2, at 6. The technology was developed by Plaintiff Michael Collins for producing synthetic natural gas and other fuels from coal. ECF No. 1-3, at 14. Collins' technology involved using high temperatures and high pressures to create clean-burning synthetic fuels from coal, petroleum coke, and biomass. ECF No. 1-3, at 15-16. Collins, along with retired University of Maryland professor Robert Bach, patented the process in 2009. ECF No. 1-3, at 16.

NC12 began as a Texas limited liability company named Texas Syngas, LLC. ECF No. 1-2, at 7-8. Texas Syngas was formed in October 2004 to exploit the technology portfolio of a defunct company called Molten Metal Technology, Inc., which had been founded and promoted by Defendant John Preston. ECF No. 1-2, at 7; ECF No. 1-3, at 15. Quantum Catalytics, Inc., another entity controlled by Preston, purchased Molten Metal Technology's portfolio in 1999. ECF No. 1-2, at 7; ECF No. 1-3, at 15. In May 2006, Quantum Catalytics licensed its technology to Texas Syngas in return for 10% of the available shares. ECF No. 1-2, at 8. Collins agreed to contribute his intellectual property to Texas Syngas in exchange for 754,500 shares (approximately 75%) of Texas Syngas. ECF No. 1-2, at 8; ECF No. 1-3, at 16. Collins

kept 100,000 shares personally and transferred the other shares to EnVen, Inc. and Metal Catalyst Ventures, Inc., Nevada companies owned by his wife, Ellen Collins. ECF No. 1-2, at 8.

Texas Syngas was reorganized as a new Nevada corporation, Texas Syngas, Inc., in May 2006. ECF No. 1-3, at 16.

Texas Syngas began raising significant capital in 2007. ECF No. 1-2, at 9; ECF No. 1-3, at 16. Through Preston and his contact Johan von der Goltz, Texas Syngas raised at least $12 million from European investors. ECF No. 1-2, at 9. Von der Goltz's friends, family, and business associates invested $11.75 million in exchange for approximately 13% of the company. ECF No. 1-3, at 17. These investors included some of the Intervenors ("Shareholder Intervenors"). ECF No. 1-3, at 17.

Sydow and Preston represented to the Shareholder Intervenors that the value of the technology exceeded $100 million and that the funds would be used for building a demonstration reactor. ECF No. 1-3, at 17.

The funds were also intended to be used to acquire a research and development facility in Fall River, Massachusetts. EFC No. 1-2, at 9. The facility was formerly owned by Molten Metal Technology and was acquired by the Meissner Trust, an entity owned by Preston and Paul Lohnes. ECF No. 1-3, at 15. Texas Syngas structured the acquisition of the facility by Fall River Realty, Ltd. ECF No. 1-2, at 9. Preston and Lohnes retained an ownership interest in Fall River Realty. ECF No. 1-2, at 9-10. Preston and Lohnes, through a complex transaction, transferred to Collins an interest in Fall River Realty in exchange for $3.5 million and Texas Syngas shares. ECF No. 1-2, at 10.

Preston and Sydow told the shareholders that Texas Syngas had purchased the Fall River facility, but the property was never actually transferred to Texas Syngas. ECF No. 1-3, at 18-19.

Sydow became the Chief Executive Officer of Texas Syngas with an annual salary of $360,000. ECF No. 1-2, at 9. Sydow, a lawyer, agreed to stop practicing law and devote his full efforts to building Texas Syngas. ECF No. 1-2, at 9. Sydow worked from office space in Houston, paying salaries to officers and employees and pursuing execution of Texas Syngas's business plan. ECF No. 1-2, at 9.

Collins began working at the Fall River facility to build a full scale gasification system prior to commercial development, retaining the necessary consultants and employees. ECF No. 1-2, at 10. Collins and Bach assigned the patented gasification technology to Texas Syngas on May 14, 2009. ECF No. 1-3, at 19.

Texas Syngas negotiated a deal with the Central Louisiana Electric Company (CLECO) in early 2008, for a 10-reactor plant to begin operations in the fall of 2012. ECF No. 1-3, at 18. In the summer of 2008, Preston claimed that he had secured $30 million in financing through C Change, but the money never materialized. ECF No. 1-3, at 18.

By 2009, Texas Syngas needed additional funding. Von der Goltz raised a total of $6,104,000.00 from friends, family, and business associates. ECF No. 1-3, at 20. These investors, who included the remainder of the Intervenors ("Note Holder Intervenors"), were issued convertible promissory notes, which provided for automatic conversion into common shares at a 20% discount if the company obtained qualified financing from a single investor of at least $5 million on or before September 30, 2010. ECF No. 1-3, at 20. Preston and Sydow represented to the Note Holder Intervenors that the company was worth $300 million as of 2009, based on the value of the technology and the CLECO contract and prospective contracts with the Turkish national coal company. ECF No. 1-3, at 21, 26. The prospective Turkish contracts were

to be obtained through the efforts of von der Goltz and Dr. Aydin Muderrisoglu.  ECF No. 1-3, at 26.

However, the CLECO contract had already been canceled.  Preston and Sydow did not disclose the cancellation of the contract.  ECF No. 1-3, at 21.  Preston and Sydow represented that the money would be used primarily to build the test reactor.  ECF No. 1-3, at 21.

The Intervenors allege that Preston and Sydow had no intention of using shareholder money as represented to the shareholders.  ECF No. 1-3, at 19.  While they controlled the board of directors, they "made sure that the bulk of the money actually went to them or to several of their related entities, rather than to build the demonstration reactor."  ECF No. 1-3, at 19. C Change, Preston's company, was "apparently" paid a $40,000 per month consulting fee.  ECF No. 1-3, at 19.  Sydow and Preston had the company pay tens of thousands of dollars every month to lawyers and consultants and for other expenses that did not benefit the shareholders or the corporation, but instead benefited Sydow and Preston.  ECF No. 1-3, at 19-20.

Although Sydow had agreed to devote all of his time to Texas Syngas when he was hired as CEO, he continued practicing law, spending most of his time on his own law practice and using Texas Syngas employees to do work for his firm.  ECF No. 1-3, at 20.

Also in 2009, Texas Syngas became NC12.  ECF No. 1-2, at 11.  Sydow and Preston managed the transfer of assets and liabilities to the new entity.  ECF No. 1-2, at 11.  TSI was dissolved.  ECF No. 1-2, at 11.  Sydow remained as CEO and was joined on the board of directors by von der Goltz and Muderrisoglu.  ECF No. 1-3, at 22.

In March 2009, C Change Investments, Preston's investment company, acquired a small interest in NC12.  Through 2009, Preston and Sydow developed the prospects for a Louisiana

production facility, and Collins oversaw research and development of the reactor in Fall River. ECF No. 1-2, at 11.

Collins began having problems with contractors at the Fall River facility by late 2009. ECF No. 1-2, at 11. One contractor placed a stop on all work until NC12 paid over $1.2 million in past due invoices.

Von der Goltz began investigating the funding issues, contacting an accountant to review NC12's financial records. ECF No. 1-2, at 12. The accountant did a limited review of the Fall River accounting process and then requested a set of books for NC12. ECF No. 1-2, at 12. After obtaining the Quickbooks file, the accountant raised concerns about NC12's use of funds, including large amounts of professional fees and expenses. ECF No. 1-2, at 12. The accountant recommended a forensic audit and noted that very little of the money raised had been spent on developing the reactor at the Fall River facility. ECF No. 1-2, at 12. Instead, much of the money had been spent on travel, offices, professional fees, outside consultants, and undisclosed lease payments for an airplane. ECF No. 1-2, at 12; ECF No. 1-3, at 23.

Collins and von der Goltz were aligned. After von der Goltz delivered the audit request to Sydow, Sydow obtained an injunction in Montgomery County against Collins. ECF No. 1-2, at 12. Sydow removed Collins from all company operations in August 2010 and closed off access to company records. ECF No. 1-2, at 12. Sydow and Preston removed Collins, von der Goltz, and Muderrisoglu as directors and named Christoph Henkel as a director. ECF No. 1-2, at 12; ECF No. 1-3, at 25. Sydow, Preston, and Henkel, as a board, voted to fire Collins and bar him from company property. ECF No. 1-3, at 25. The board also revoked all access to company bank accounts and records for von der Goltz and Muderrisoglu. ECF No. 1-3, at 25. As a result of Preston, Sydow, and Henkel's takeover, NC12 lost the Turkish contracts.

About $300,000 remained to be paid to vendors for the cost of the reactor. After Sydow, Preston, and Henkel fired Collins, all progress on the reactor halted, and the board refused to pay the outstanding bills. A vendor repossessed the reactor and sold it for scrap. ECF No. 1-3, at 29.

Preston, Sydow, and Henkel, along with their companies, worked with Sonia Lo and Chalsys Capital Partners, LLP, to strip NC12 of its assets and transfer the assets to Meliora Energy Technologies, S.A.R.L., a Luxembourg limited liability company established on September 14, 2010 and controlled by Sydow, Preston, Henkel and Lo and owned by C Change, Chalsys, and Henkel. ECF No. 1-2, at 12-13; ECF No. 1-3, at 27. Sydow, Preston, and Henkel represented to shareholders that Meliora would provide a $1.5 million bridge loan to NC12, along with a commitment of an additional $5 million investment, in exchange for the license to use NC12's technology in Europe, Asia, and Africa. ECF No. 1-3, at 27.

However, Sydow, Preston, and Henkel assigned all of NC12's technology to Oscura, Inc., a company believed to have been created and controlled by Sydow, on September 1, 2010. ECF No. 1-3, at 28. Oscura assigned the patents to Meliora via a security agreement. ECF No. 1-3, at 28. Meliora began paying Sydow a monthly fee of $15,000. ECF No. 1-3, at 28.

Meliora's supposed $5 million financing resulted in the automatic conversion of the promissory notes into common shares. The conversion diluted the "old" shareholder group's ownership from 100% to 30.3%. ECF No. 1-3, at 28. However, Meliora never made the $5 million investment. ECF No. 1-3, at 28. According to the Intervenors, it is believed that NC12 received no more than $500,000 for its patented technology. ECF No. 1-3, at 28.

In December 2010, all employees of NC12 were terminated and all business operations ceased. ECF No. 1-3, at 28.

In May 2011, Fall River Realty sold the Fall River facility to Brilliant Novelty, LLC for $2.6 million. Lohnes and Preston are members and managers of Brilliant Novelty, and Brilliant Novelty obtained a $2.6 million mortgage on the property. ECF No. 1-2, at 13. Sydow filed a certificate of vote stating that the Fall River Realty shareholders had approved the transaction. However, Collins, the majority shareholder in Fall River Realty, was never consulted about the sale. ECF No. 1-2, at 13.

On October 14, 2011, Sydow caused a voluntary chapter 11 petition to be filed on behalf of NC12. The petition states that NC12 has no assets. ECF No. 1-3, at 29.

## Analysis

If a cause of action belongs to the estate, then the Trustee has exclusive standing to assert the claim. *Schertz-Cibolo-Universal City, Indep. Sch. Dist. (In re Educators Grp. Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994). If, on the other hand, a cause of action belongs to the Plaintiffs and Intervenors, the Court must consider whether it has subject matter jurisdiction over the claims. If the Court lacks subject matter jurisdiction over claims because the claims do not relate to NC12's bankruptcy, then the Court must remand the claims.

If the Plaintiffs and Intervenors lack standing to bring claims, the Court must dismiss the claims for lack of subject matter jurisdiction. *See Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum)*, 522 F.3d 575, 583 (5th Cir. 2008) ("If the claims belong to the estate, then it was not error for the bankruptcy court to deny remand (because it has jurisdiction over all property of the estate) and dismiss the claims (because the trustee has exclusive standing to assert claims belonging to the estate)."); *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006) ("[T]he issue of standing is one of subject matter jurisdiction.").

Whether a particular cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case. *Educators Grp.*, 25 F.3d at 1284. If a cause of action alleges only indirect harm to a creditor (i.e., an injury that derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate. *Id.*

NC12 is incorporated under Nevada law. Nevada law therefore governs the internal affairs of NC12. Tex. Bus. Org. Code § 1.102 ("[T]he law of the state [in which an entity is formed] . . . governs the formation and internal affairs of the entity."); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941) (holding that a federal court sitting in diversity applies the conflict of laws rules of the forum state); *Hollis v. Hill*, 232 F.3d 460, 465 (5th Cir. 2000) (applying Texas choice of law rules and concluding that Nevada law governs internal affairs of corporation incorporated in Nevada); *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 396 (Bankr. N.D. Tex. 2011) (applying Texas choice of law rules, which provide that internal affairs of a foreign corporation a governed by the law of the state of incorporation).

Although the Court first considers whether NC12 could have raised claims outside of bankruptcy, the Court also looks at the underlying injury for which relief is sought.

> [S]ome claims that are usually brought by creditors outside of bankruptcy (and thus in a sense may be said to "belong to" the creditors and not the debtor) are nonetheless vested exclusively in the trustee in bankruptcy. This is so not merely because the claims are common to a number of creditors, but because they ultimately seek to recover assets of the estate that are not under the debtor's control—by reason of a fraudulent transfer, for instance, or because of the existence of separate corporate entities that are a sham.

*Seven Seas*, 522 F.3d at 589.

The Trustee's exclusive standing protects the Bankruptcy Code's distribution scheme. "Since one of the goals of the Bankruptcy Code is to preserve property of the bankruptcy estate and ensure that similarly situated creditors receive equal distributions, if a cause of action belongs to the debtor, only the trustee or debtor in possession may pursue it." *In re Cabrini Med. Ctr.*, 2012 WL 2254386, at *6 (Bankr. S.D.N.Y. June 15, 2012) (citing *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1152 (5th Cir. 1987)) (citations omitted).

If claims are not owned by the bankruptcy estate, the Court must consider whether it has subject matter jurisdiction over the claims.   The Bankruptcy Court's subject matter jurisdiction is limited to bankruptcy cases and proceedings that arise under the Bankruptcy Code, arise in a bankruptcy case, or are related to a bankruptcy case. 28 U.S.C. § 1334.  The Court therefore has subject matter jurisdiction only over claims that arise under the Bankruptcy Code, arises in the NC12 bankruptcy case, or are related to NC12's bankruptcy case.

A proceeding arises under the Bankruptcy Code when a plaintiff asserts a right created by the Bankruptcy Code. *Wilborn v. Wells Fargo Bank (In re Wilborn)*, 609 F.3d 748, 752 (5th Cir. 2010).  When a plaintiff asserts a claim that could not exist outside of bankruptcy, the proceeding arises in a bankruptcy case. *Id.*

An action is related to a bankruptcy case if the outcome could conceivably affect the bankruptcy estate. *Edge Petroleum Operating Co. v. GPR Holdings, LLC (In re TXNB Internal Case)*, 483 F.3d 292, 298 (5th Cir. 2007).  "Certainty is unnecessary; an action is 'related to' bankruptcy if the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankruptcy estate." *Id.*

If the Court has only "related-to" jurisdiction over a claim, the claim may be subject to mandatory abstention. Mandatory abstention applies when a proceeding: (i) is based upon a state law claim or state law cause of action; (ii) is related to a bankruptcy case but not arising under the Bankruptcy Code or arising in the bankruptcy case; (iii) could not have been commenced in a federal court other than through bankruptcy jurisdiction; and (iv) was commenced and can be timely adjudicated in a state court. 28 U.S.C. § 1334(c)(2).

Even if the requirements for mandatory abstention are not met, the Court may discretionarily abstain from hearing a proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law." 28 U.S.C. § 1334(c)(1). "Nothing . . . prevents a court from permissively abstaining under § 1334(c)(1) where some, but not all, of the requirements for mandatory abstention are met. The decision to abstain or not to abstain is committed to the discretion of the district court[.]" *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1207 (5th Cir. 1996). In exercising its "broad discretion" to decide whether to abstain under § 1334(c)(1), a court may consider the following non-exclusive factors:

(1)     the effect or lack thereof on the efficient administration of the estate;

(2)     the extent to which state law issues predominate over bankruptcy issues;

(3)     the difficult or unsettled nature of applicable law;

(4)     the presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

(5)     the jurisdictional basis, if any, other than § 1334;

(6)     the degree of relatedness or remoteness of proceeding to main bankruptcy case;

(7)     the substance rather than the form of an asserted core proceeding;

(8)     the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

    (9)     the burden of the bankruptcy docket;

    (10)    the likelihood that commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

    (11)    the existence of a right to a jury trial;

    (12)    the presence in the proceeding of non-debtor parties;

    (13)    comity; and

    (14)    the possibility of prejudice to other parties in the action.

*Shipley Garcia Enters., LLC v. Cureton*, 2012 WL 3249544, at *12 (S.D. Tex. Aug. 7, 2012) (quoting *Ramirez v. Rodriguez (In re Ramirez)*, 413 B.R. 621, 631-32 (Bankr. S.D. Tex. 2009)).

### Intervenors' Shareholder Oppression Claim

       To determine whether the shareholder oppression claim is property of the estate, the Court looks at whether, under state law, the claim could have been asserted by NC12 and whether, under the test set forth in *Educators Group* and *Seven Seas*, the Intervenors assert an injury that is not merely derivative of injury to NC12.

       NC12 could have asserted any claims that, under Nevada state law, enforced the corporation's rights. This is true both for rights normally enforced directly by the corporation or normally enforced through a shareholder derivative action. *See San Mateo Plaintiffs v. At Home Corp. (In re At Home Corp.)*, 154 F. App'x 666, 668 (9th Cir. 2005) ("A bankruptcy court may enjoin a derivative claim brought by shareholders because the claim is the property of the bankrupt estate."); *In re AgriBioTech*, 319 B.R. 216, 223 (D. Nev. 2004) (holding that, pre-bankruptcy, a breach of fiduciary duty claim had belonged to the corporation, because the claim was enforceable directly by the corporation or through a derivative action) (citing *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939)); *Sobchak v. Am. Nat'l Bank & Trust Co. of Chicago (In re*

*Ionosphere Clubs, Inc.)*, 17 F.3d 600, 604 (2d Cir. 1994) (holding that claims that were classified as derivative under Delaware law, the governing law, belonged exclusively to the bankruptcy estate).  Therefore, the Court first examines Nevada law.

Under Nevada law, allegations of generalized injury to the corporation give rise to a derivative claim, not a direct claim.  *See Cohen v. Mirage Resorts, Inc.*, 62 P.3d 720, 734 (Nev. 2003) ("This is harm to the corporation, shared by all stockholders and not related to an individual stockholder.  To the extent these allegations were intended to state a cause of action, the district court was correct in dismissing the allegations as derivative claims barred by lack of standing.").  The Court therefore looks at the nature of the injury alleged to determine whether the action was derivative under Nevada law—and thus, assuming it was a valid claim, could have been asserted by NC12.

The parties have extensively argued the issue of whether Nevada law recognizes a claim for shareholder oppression and whether such a claim would be a direct claim.  Two federal cases—one from the Fifth Circuit and one from the District of Nevada—predict that the Nevada Supreme Court would recognize a claim for shareholder oppression.  *Hollis*, 232 F.3d at 468 (holding that there was "strong indication that the Nevada Supreme Court would find fiduciary obligations between shareholders in a corporation such as FFUSA operated by shareholder-directors"); *Simon v. Mann*, 373 F.2d 1196, 1199-1200 (D. Nev. 2005) (holding that shareholders of a closely-held corporation could assert a direct suit against majority shareholders).  In 2011, however, the Nevada Supreme Court stated in dicta that "Nevada does not recognize a cause of action for abuse of control, and in the case to which appellants cite, claims for abuse of control are essentially claims for breach of the fiduciary duty of loyalty."  *In re Amerco Deriv. Litig.*, 252 P.3d 681, 700 n.11 (Nev. 2011).

It is unclear whether the "abuse of control" cause of action referred to in *Amerco* is the same cause of action that the courts in *Hollis* and *Simon* predicted the Nevada Supreme Court would recognize.  Because this area of Nevada law is uncertain, the Court does not make an unnecessary pronouncement of whether there is a shareholder oppression claim under Nevada law and, if so, whether such a claim is available to shareholders of NC12.  The Court merely concludes that under *Cohen*, the specific injuries pleaded by the Intervenors in this case should be classified as derivative, not direct.

The *Educators Group* and *Seven Seas* test produces the same result.  If the nature of the alleged injury is purely derivative of injury to NC12, the claims are property of the estate even if they could normally be asserted by creditors outside of bankruptcy.  *Seven Seas*, 522 F.3d at 589; *see Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 355 (5th Cir. 1999) (holding that even though alter ego and veil-piercing claims are typically brought by a creditor, corporations can bring such claims on their own behalf and in bankruptcy, the claims may be asserted only by the estate) (citing *S.I. Acquisition*, 817 F.2d at 1152).

The Intervenors' shareholder oppression claim in this case is property of the estate.  In their statement of the shareholder oppression cause of action, the Intervenors assert that the Defendants oppressed them as shareholders by:

- Taking control of the corporation, stripping it of its assets for their own personal gain, misappropriating corporate assets, and self-dealing;

- Secretly and questionably removing von der Goltz and Muderrisoglu, who were reputable, independent of Preston and Sydow, and trusted by the shareholders, in direct violation of a previous agreement among a super-majority of the shares; and

- Thwarting investigative efforts into the company's accounting practices.

ECF No. 1-3, at 31-32.  The Intervenors seek the following remedies:

- A court-ordered buy-out of their shares at a fair price;

- Actual and exemplary damages;

- Disgorgement;

- Restitution;

- Other equitable relief; and

- Punitive damages.

ECF No. 1-3, at 32.

Even if Nevada law allows a claim for shareholder oppression, any claim based on the Defendants' alleged stripping of corporate assets is property of the estate.  Any injury suffered by the alleged misappropriation, asset-stripping, and self-dealing was derivative of the harm to NC12.  The Intervenors may seek damages for the violation of their shareholder rights, but only for damages not derivative of damages to the corporation; they may not seek damages for dilution of corporate value due to the alleged stripping or misappropriation of corporate assets. Any claim for damages due to stripping or misappropriation of corporate assets belongs to the estate and may be asserted only by the Trustee.

The alleged violation of the shareholders' rights by the removal of von der Goltz and Muderrisoglu and the alleged thwarting of shareholders' rights to investigate accounting practices do not give rise to direct claims.  Although it is possible that a loss of shareholder influence or the violation of shareholders' investigative rights could result in a direct injury to shareholders, the Intervenors have not stated such circumstances here.  The Intervenors do not allege any particularized injury arising from the removal of von der Goltz and Muderrisoglu independent of the harm caused to the corporation—e.g., through the alleged loss of the Turkish

contracts.    Because all injuries allegedly caused by the removal of von der Goltz and Muderrisoglu were incurred by the corporation, and any injury to the shareholders was derivative of the injury to NC12, the claim belongs to the estate.

Similarly, the alleged injury from the thwarting of investigative efforts was the inability to discover and remedy harms to the corporation caused by the misappropriation of assets and self-dealing.  This injury is derivative of the injury to the corporation and therefore belongs to the estate.

The shareholder oppression claim is property of the estate.  Therefore, it is dismissed for lack of standing.

***Plaintiffs' and Intervenors' Breach of Fiduciary Duty Claims***

The Plaintiffs and Intervenors allege that the Defendants breached their fiduciary duties to NC12 by self-dealing and mismanagement.  The Plaintiffs refer to their general allegations of mismanagement and assert that the Plaintiffs are, "as shareholders of NC12, . . . entitled to recover from [the Defendants] *their proportionate share* of economic injuries in an amount in excess of the jurisdictional minimum of this court." ECF No. 1-2, at 14 (emphasis added).

The Intervenors refer to their general allegations of mismanagement and also allege three specific breaches of fiduciary duty:

- Sydow's theft and misappropriation of corporate assets, including but not limited to use of corporate funds to pay for his private plane, use of corporate resources for his law practice without compensation to the company, the use of corporate funds for personal expenses, and bogus fees for lawyers, consultants, and services that did not benefit NC12;

- Failure to transfer title of the Fall River property to the corporation and instead transferring it to an entity in which Sydow and Preston held an individual interest, and charging the corporation rent for use of its own property;

- Transfer of the technology of the corporation—its most valuable asset, worth hundreds of millions of dollars—for grossly inadequate consideration to an entity in which Sydow, Preston, and other Defendants had individual interests.

ECF No. 1-3, at 30.

Neither the Plaintiffs' general allegations of mismanagement nor the Intervenors' specific alleged breaches of fiduciary duty involve any alleged injury directly to the shareholders. All of the Plaintiffs' and Intervenors' allegations pertain to injuries to NC12. The generalized allegations of mismanagement and self-dealing, which refer back to the Plaintiffs' and Intervenors' overall narrative of NC12's collapse, all relate to injuries to the corporation. There is no indication of any harm to shareholders *other than* the harm to the corporation.

Similarly, the specific alleged breaches of fiduciary duty do not state any injury to shareholders other than through the corporation. The alleged theft and misappropriation of corporate assets is an alleged injury to NC12, not the shareholders. Similarly, the alleged failure to transfer title of the Fall River property to NC12 is an alleged injury directly to NC12. Finally, the alleged transfer of NC12's technology is an alleged harm to NC12; the only harm to the shareholders is derivative of the alleged harm to NC12.

The essence of Plaintiffs' and Intervenors' breach of fiduciary duty claims is that the Defendants stripped NC12 of assets to the detriment of NC12's creditors and shareholders. The claims are fundamentally derivative, predicated on injury to NC12, not on injury to individual Plaintiffs or Intervenors. The Plaintiffs' complaint states that the shareholders' injury as a result of the economic harm to NC12 is "proportionate." Such proportionate injuries must be recovered through the estate.

The breach of fiduciary duty claim is property of the estate. Only the Trustee has standing to assert the claim, and therefore the Court dismisses the claim for lack of subject matter jurisdiction.

The Plaintiffs' claim for aiding and abetting breach of fiduciary duty is dependent on the underlying breach of fiduciary duty claim. Because the breach of fiduciary duty claim is property of the estate, the aiding and abetting claim is also property of the estate. *Deep Marine Holdings, Inc. v. FLI Deep Marine LLC (In re Deep Marine Holdings, Inc.)*, 2011 WL 2420274, at *10 (Bankr. S.D. Tex. June 13, 2011) ("The aiding and abetting claims are derivative claims to the extent that the actions that were aided and abetted resulted in derivative injuries[.]").

*Intervenors' Statutory and Common Law Fraud Claim*

The Intervenors allege that the Defendants made false representations upon which the Intervenors relied when they invested in NC12. ECF No. 1-3, at 21, 32-33. The Intervenors allege that the Defendants solicited investments by falsely representing that the company was worth $100 million and, later, $300 million, that the corporations would use the investment money to build the reactor, and that the CLECO deal was in place when it had been cancelled. ECF No. 1-3, at 32-33. The Intervenors allege that they "suffered actual damages proximately caused by Preston and Sydow's fraud."

The Trustee concedes that the securities fraud claims, as pleaded, are direct claims owned by the Intervenors. The Court agrees.

The Fifth Circuit held in *Seven Seas* that a conspiracy to defraud claim based on allegations that defendants employed material misrepresentations to induce potential investors to acquire unsecured notes was "a direct injury to the bondholders that was independent of any injury to Seven Seas." 522 F.3d at 586. The Fifth Circuit further noted that it "doubt[ed] that,

under applicable state law, Seven Seas could have raised either claim as of the commencement of the bankruptcy case." *Id.* The bondholders' fraud claims were therefore property of the bondholders, not the bankruptcy estate.

The Intervenors' fraud claims are similar; the only material distinction is that the *Seven Seas* claims were brought by bondholders and the Intervenors are shareholders of NC12. Because the Intevenors are shareholders, their fraud claim is based on the alleged difference between the price they paid in reliance on the alleged misrepresentations and the actual value of NC12's shares at the time of their investment. The Intervenors may not recover damages for the difference between the price they paid for the shares and what the shares would have been worth if not for the alleged post-purchase misconduct in the operation of the corporation. However, they may recover damages for the amount they allegedly overpaid as a result of Sydow and Preston's alleged misrepresentations.[1] With these limitations, the Intervenors' claims for harm due to fraudulently induced investment are independent of any harm directly to NC12; indeed, NC12 benefited from the Intervenors' investments by having their cash.

Because the Intervenors' fraud claims allege an injury to the Intervenors that is not merely derivative of the alleged harm to NC12, the Intervenors own the claims resulting from fraud or misrepresentations that occurred at the time that they made their investment.

The Court discretionarily abstains from hearing the Intervenors' fraud claim because it is only remotely related to the NC12 bankruptcy case.

The Defendants argue that the claim is related to the bankruptcy case because the Intervenors' potential recovery may draw from NC12's directors and officers' liability policy.

---

[1] The Intervenors do not state, and this Court does not decide, which jurisdiction's law governs their fraud claims. The Court's ruling regarding the recoverable damages relates solely to the issue of which injuries give rise to claims belonging to the Intervenors. The Court does not rule on the appropriate measure of damages for the Intervenors' fraud claims.

NC12's insurance policy with Philadelphia Indemnity Insurance Company covers both the corporation and its directors and officers against losses due to claims against the directors and officers or against NC12 relating to alleged malfeasance by directors and officers. ECF No. 30, at 31. The policy's proceeds are capped at $1,000,000.00, with an additional $1,000,000.00 available for defense fees. ECF No. 30, at 15, 56. Because the proceeds are capped at $1,000,000.00, the Defendants argue, any recovery by the Intervenors will reduce the amount available to NC12 for its own claims against directors and officers.

Insurance proceeds that are applied to a claim against directors and officers are not property of the estate, and actions to collect such proceeds are not barred by the automatic stay. See *Unsecured Creditors Disbursement Committee v. Antill Pipeline Constr. Co. (In re Equinox Oil Co.)*, 300 F.3d 614, 618 (5th Cir. 2002) ("An insurance policy owned by the debtor is generally considered property of the estate. But, whether the proceeds of a particular insurance policy is property of the estate depends on the nature of the policy.") (citing *In re Edgeworth*, 993 F.2d 51, 55 n.13 (5th Cir. 1993)). "The overriding question when determining whether proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim. When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate." *Edgeworth*, 993 F.2d at 55.

The Philadelphia Indemnity policy applies to claims against the directors and officers or against NC12. ECF No. 30, at 31. The policy provides liability coverage for the directors and officers and NC12 and indemnity coverage for NC12 for claims against the directors and officers. Although NC12 could be the beneficiary of the indemnity coverage, any payment to the directors and officers for liability coverage would offset a potential indemnification claim. *See*

*Louisiana World Exposition, Inc. v. Federal Ins. Co. (In re Louisiana World Exposition, Inc.)*, 832 F.2d 1391, 1400 (5th Cir. 1987) (holding that proceeds were not property of the estate, despite cap on the total of liability and indemnity coverage, where "any payment under the liability coverage reduces the amount of the potential indemnification claim to the same extent that policy amounts available for indemnification are thus reduced. There is not the potential for increasing the estate's exposure by payment of liability proceeds due.").

NC12 would not have a right to receive and keep the proceeds of claims against the liability coverage for losses caused to third parties (such as the Intervenors) by the directors and officers. *See Edgeworth*, 993 F.2d at 56 ("[U]nder the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy. Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract.").

The estate could have a right to receive proceeds on account of its own claims against the directors and officers. However, the estate has only a contractual right to recover if certain conditions are met; the proceeds do not become property of the estate until the contractual conditions are met. *Maxwell v. Meglioga (In re marchFIRST, Inc.)*, 288 B.R. 526, 530 (Bankr. N.D. Ill. 2002) ("The Debtors had and the Trustee has contractual rights governed by the terms of the insurance policies. Unless and until the terms are met, which they may never be, the proceeds are not property of the estate.").

The directors and officers' liability proceeds are not the kind of proceeds that *Edgeworth* holds may be included as property of the estate. 993 F.2d at 56 ("Examples of insurance policies whose proceeds are property of the estate include casualty, collision, life, and fire insurance policies in which the debtor is a beneficiary. Proceeds of such insurance policies, if made

payable to the debtor rather than a third party such as a creditor, are property of the estate and may inure to all bankruptcy creditors."). The policies listed in *Edgeworth* are those for which the debtor is the designated beneficiary and the party to whom proceeds would be paid. This is not the case with the NC12's directors and officers' liability coverage. The estate may be entitled to proceeds from the policy, but so may other parties. If the estate recovers from the directors and officers' liability coverage, its recovery will be on the same terms as other injured parties' recovery. The estate's ownership of the policy does not affect the outcome. The estate does not have a greater interest in the proceeds than any other person suing on an indemnified claim. *See Boles v. Turner (In re Enivid, Inc.)*, 364 B.R. 139, 157 (Bankr. D. Mass. 2007) (denying liquidating trustee's motion for an injunction to prevent shareholders from entering into a settlement of fraud claims against directors and officers where the settlement was payable from the directors and officers' liability policies and might affect trustee's ability to recover); *Reliance Acceptance Grp., Inc. v. Levin (In re Reliance Acceptance Grp., Inc.)*, 235 B.R. 548, 561 (D. Del. 1999) ("The difficulty the Debtors have is in identifying a right to the relief; that is, they have been unable to identify a legal principle that stands for the proposition that the Estate's claims for relief should take precedence over the Shareholders' claims.").

Because the estate does not own the proceeds, the Court must consider whether the potential diminution of the proceeds is sufficient to establish related-to jurisdiction.

The burden is on the Defendants, as the removing parties, to establish federal jurisdiction. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) ("[T]he party asserting federal jurisdiction when it is challenged has the burden of establishing it."). Even if the Intervenors prevail and collect against the insurance proceeds, their claim will affect the estate only if (i) there are not sufficient funds remaining under the insurance policy to satisfy the estate's claims;

and (ii) the estate successfully asserts claims against directors and officers;[2] and (iii) the directors or officers have insufficient assets to satisfy the claims.

The Court recognizes the possibility that (i) the Intervenor's claim could exhaust the insurance policy; and (ii) the estate could prevail against the Defendants; and (iii) the Defendants could have inadequate other resources to pay a judgment.  Should these events occur, the outcome of the shareholder oppression claim could affect the amount of proceeds available to the estate for its own claims against officers and directors.  This remote effect is, at most, on the outer fringes of the Court's related-to jurisdiction.  *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752 (5th Cir. 1995) (noting that a bankruptcy court's related-to jurisdiction "cannot be limitless" and stating that an action "is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and . . . in any way impacts upon the handling and administration of the bankruptcy estate.") (quoting *Walker v. Cadle Co. (In re Walker)*, 51 F.3d 562, 569 (5th Cir. 1995)).  However, a related proceeding's effect on the bankruptcy estate may be contingent.  *See TXNB Internal Case*, 483 F.3d at 298 (holding that court had related-to jurisdiction over a dispute between two non-debtor parties when, depending on the outcome, either the defendant or the debtors owed money to the plaintiff).

The Court cannot conclude that the outcome of the fraud claims could have no "conceivable effect" on the estate.  *See Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 587 (5th Cir. 1999) ([T]he law is well established in this Circuit, as in others, that, when testing 'related to' jurisdiction, an effect is not required to a certainty.  Rather, jurisdiction will attach on a finding of any *conceivable* effect.").  Contingent or tangential effects may be

---

[2] The Trustee has sued Michael Collins in a separate adversary proceeding.  It is unclear whether the claim against Collins would be covered by the Philadelphia Indemnity policy.

sufficient in the Fifth Circuit to establish related-to jurisdiction. *Id.* at 587 n.30 ("[E]ven a proceeding which portends a mere contingent to tangential effect on a debtor's estate meets the broad jurisdictional test[.]") (quoting *National Union Fire Ins. Co. v. Titan Energy, Inc. (In re Titan Energy, Inc.)*, 837 F.2d 325, 330 (8th Cir. 1988)).

The Court does not apply mandatory abstention, because there is no evidence before the Court as to whether the fraud claims could be timely adjudicated before the state court. *See Carriage Credit Corp. v. Flanagan (In re Draper)*, 2010 WL 4736168, at *3 (Bankr. S.D. Tex. Nov. 15, 2010) ("A party moving for mandatory abstention must provide the court with more than a 'naked assertion' that the action can be timely adjudicated in state court.") (quoting *Mugica v. Helena Chem. Co. (In re Mugica)*, 362 B.R. 782, 793 (Bankr. S.D. Tex. 2007)).

Nevertheless, the Court discretionarily abstains from hearing the fraud claims. *See Shipley Garcia Enters.*, 2012 WL 3249544, at *12 (listing non-exclusive factors a court may consider in exercising its "broad discretion" to abstain under 28 U.S.C. § 1334(c)(1)). The fraud claims, at most, remotely relate to the bankruptcy proceedings, and the efficient administration of the estate will not be affected by the remand. The estate is not a party to the litigation. It is true that the depletion of the insurance proceeds may affect the estate; however, the Court does not have the authority to prevent this effect. There is no jurisdictional basis other than bankruptcy related-to jurisdiction, and the claim involves solely state law issues. Moreover, this Court's constitutional authority to enter a final judgment with respect to the fraud claim is doubtful under *Stern v. Marshall*, 131 S.Ct. 2594, 2620 (2011). The Court therefore remands the Intervenors' fraud claims.

*Collins' Conversion Claim*

Michael Collins' conversion claim against Sydow, Preston, C Change Investments, and Brilliant Novelty may be either direct or derivative, depending on whether Collins has an interest in Fall River Realty. Collins alleges that he suffered damages from the sale of the real property as an owner of Fall River Realty. Collins seeks actual and exemplary damages.

The Trustee concedes that Collins' conversion claim, as currently pleaded, is a direct claim. ECF No. 25, at 9. If Collins is an owner of Fall River Realty, this conclusion is correct.

However, the Trustee contends in Adv. No. 12-3266 that 100% of Fall River Realty is owned by the estate. In that adversary proceeding, the Trustee seeks declaratory judgment against Michael Collins, Ellen Collins, and BOS, Inc. stating that no Defendant owns an interest in Fall River Realty or the Fall River property. The Trustee also seeks a judgment that the Fall River property is subject to a resulting trust in favor of the Trustee for the benefit of the bankruptcy case.

If the estate is the owner of 100% of Fall River Realty, any claim for conversion of an interest in Fall River Realty belongs to the estate.

Property that is "arguable property" of the estate is protected by the automatic stay from unilateral action by creditors. *Brown v. Chesnut (In re Chesnut)*, 356 F. App'x 732, 734 (5th Cir. 2009) (citing *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 303-04 (5th Cir. 2005)). Because the Trustee's complaint asserts a plausible claim, as between the estate and Collins, to ownership of Fall River Realty, Fall River Realty is arguable property of the estate. Claims for conversion of interests in Fall River Realty are therefore also arguable property of the estate.

The Court will not presently remand the conversion claim, because Collins' pursuit of the conversion claim in state court would violate the automatic stay. At the same time, if the claim

is actually owned by Collins, the Court may lack subject matter jurisdiction or the claim may be so remotely related to the NC12 bankruptcy that the Court should discretionarily abstain. The Court therefore abates consideration of the conversion claim or its remand pending the resolution of Adv. No. 12-3266.

### Intervenors' Conspiracy Claims

The Intervenors' claim for conspiracy to commit fraud and breach of fiduciary duty is dependent on the underlying claims. Because the underlying breach of fiduciary duty claim is property of the estate, the conspiracy to commit breach of fiduciary duty claim is also property of the estate. *See Deep Marine Holdings*, 2011 WL 2420274, at *10 (holding that aiding and abetting claims were property of the estate where the underlying conduct gave rise to a claim that was property of the estate). The Court dismisses the conspiracy to commit breach of fiduciary duty claim for lack of standing.

Because the remanded fraud claim is the Intervenors' property, the Intervenors own the claim for conspiracy to defraud. *See Seven Seas*, 522 F.3d at 585 (holding that conspiracy to defraud claim was owned by bondholders, not estate); *Deep Marine Holdings*, 2011 WL 2420274, at *10 (holding that aiding and abetting claims were not property the estate where underlying conduct did not give rise to a claim that was property of the estate). The Court lacks subject matter jurisdiction over the Intervenors' conspiracy to commit fraud claim. Therefore the Court remands the conspiracy to commit fraud claim.

### Conclusion

The Court dismisses the following claims for lack of standing:

- Plaintiffs' and Intervenors' claims for breach of fiduciary duty;

- Intervenors' claim for shareholder oppression; and

- Intervenors' claim for conspiracy to commit breach of fiduciary duty.

The Court remands the following claims:

- Intervenors' claims for common law and statutory securities fraud and conspiracy to commit fraud; and

- Intervenors' aiding and abetting claim related to the common law and statutory securities fraud.

Plaintiff Michael Collins' conversion claim and the remand of the conversion claim are abated pending resolution of Adv. No. 12-3266.

SIGNED **August 28, 2012.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE